IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

JAIQUAN MOORE,

PLAINTIFF.

vs

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE DETECTIVE SERAFIN
RESTO, NEW YORK CITY POLICE OFFICER
DANIEL CRUZ, NEW YORK CITY POLICE
DETECTIVE ERIK NELSON, NEW YORK CITY POLICE
OFFICER BRIAN RITTO, NEW YORK CITY POLICE
SERGEANT ERIC SONNENBERG,
NEW YORK CITY POLICE OFFICERS
"JOHN DOES 1-10,"

DEFENDANTS.

---

**CV 14-3055**

INDEX NO.

ECF CASE

COMPLAINT
[JURY TRIAL
DEMANDED]

GLEESON, J.

ORENSTEIN, M.J.

Plaintiff JAIQUAN MOORE, by his attorneys, STECKLOW COHEN &
THOMPSON and ROCHELLE S. BERLINER, complaining of the defendants,
respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.    Plaintiff JAIQUAN MOORE brings this action for compensatory damages,
punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42
U.S.C. § 1988 for violations of his civil rights, as said rights are secured by said
statutes and the Constitutions of the State of New York and the United States.

2.    On August 31, 2013, Plaintiff JAIQUAN MOORE was the sole African-
American occupant of a car driven by a Caucasian-presenting acquaintance, with
another Caucasian-presenting person also present as a passenger.  Without
apparent justification, the Defendant Police Officers pulled over the car and
apprehended Plaintiff JAIQUAN MOORE.  In the process, one or more of the
Defendant Officers brutally beat Plaintiff JAIQUAN MOORE, in the absence of
any need for such application of force.  Plaintiff JAIQUAN MOORE suffered
multiple cracked teeth,, lacerations and bruises as a result of his injuries inflicted
by police without need or justification, in the absence of due care.

## II. JURISDICTION

**3.**    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

**4.**    Plaintiff JAIQUAN MOORE further invokes this Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

## III. VENUE

**5.**    Venue is proper for the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

## IV. JURY DEMAND

**6.**    Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V. THE PARTIES

**7.**    At all times relevant to this action, Plaintiff JAIQUAN MOORE was a resident of the City of New York, State of New York, and the County of Queens.

**8.**    Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

**9.**    Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

**10.**    That at all times hereinafter mentioned, NEW YORK CITY POLICE DETECTIVE SERAFIN RESTO, NEW YORK CITY POLICE OFFICER DANIEL CRUZ, NEW YORK CITY POLICE DETECTIVE ERIK NELSON, NEW YORK CITY POLICE OFFICER BRIAN RITTO, NEW YORK CITY POLICE SERGEANT ERIC SONNENBERG, and the Defendant NEW YORK CITY POLICE OFFICERS "JOHN DOES 1-10" (collectively, "Defendant Police Officers," individually, "Defendant Police Officer") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

**11.**    That at all times relevant to this action, the Defendant Police Officers either personally or through their employees, were acting under color of state law

2

and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

**12.**  Each and all of the acts of the Defendant Police Officers alleged herein were done by said Defendants while acting within the scope of their employment by Defendant CITY OF NEW YORK.

**13.**  Each and all of the acts of the defendant Police Officers alleged herein were done by said defendants while acting in furtherance of their employment by Defendant CITY OF NEW YORK.

## VI. FACTS COMMON TO ALL CLAIMS

**14.**  Plaintiff JAIQUAN MOORE is an African-American male resident of the City and State of New York, County of Queens.

**15.**  On the afternoon of August 31, 2013, Plaintiff JAIQUAN MOORE was offered a ride by a Caucasian acquaintance, and accepted.

**16.**  A second Caucasian individual was also present in the car, a 2005 Subaru, along with Plaintiff JAIQUAN MOORE.

**17.**  Plaintiff JAIQUAN MOORE was seated in the back seat of said car and both of the Caucasian men were in the front seat of same.

**18.**  At or around the intersection of 115th Avenue and 223rd Street, in the County of Queens, the car carrying Plaintiff JAIQUAN MOORE was stopped by several of the Defendant Police Officers.

**19.**  Plaintiff JAIQUAN MOORE and the two Caucasian individuals were ordered out of the car at gunpoint.

**20.**  Plaintiff JAIQUAN MOORE complied, exiting the car.

**21.**  Plaintiff JAIQUAN MOORE asked one or more of the Defendant Police Officers what was happening.

**22.**  In response, one or more of the Defendant Police Officers moved to strike Plaintiff JAIQUAN MOORE.

**23.**  In response, one or more the Defendant Police Officers moved to handcuff Plaintiff JAIQUAN MOORE.

**24.**  Plaintiff JAIQUAN MOORE was not engaged in any criminal conduct or in possession of any contraband.

**25.** However, as an African-American male resident of the City of New York, Plaintiff JAIQUAN MOORE knew better than to assume that he had nothing to fear from the Defendant Police Officers.

**26.** On information and belief, it is widely known in New York's minority communities that innocence is not a defense to arrest by New York City Police Officers.

**27.** On information and belief, it is widely known in New York's minority communities that cooperation with New York City Police Officers will not prevent unnecessary and improper applications of force by New York City Police Officers.

**28.** Plaintiff JAIQUAN MOORE attempted to avoid the Defendant Police Officers who were trying to strike or seize him, while still inquiring as to what was happening.

**29.** In response, one or more of the Defendant Police Officers struck Plaintiff JAIQUAN MOORE in the head, causing him pain and disorientation.

**30.** None of the Defendant Police Officers had placed Plaintiff JAIQUAN MOORE under arrest or informed Plaintiff JAIQUAN MOORE that he was under arrest.

**31.** Plaintiff JAIQUAN MOORE, woozy from being struck in the head, attempted to flee the Defendant Police Officers.

**32.** Bystander video shows Plaintiff JAIQUAN MOORE stumbling away from the Defendant Police Officers, before being grabbed by a Defendant Police Officer, on information and belief Defendant NEW YORK CITY POLICE DETECTIVE SERAFIN RESTO, who proceeded to forcefully punch Plaintiff JAIQUAN MOORE in the face.

**33.** On information and belief, at that time, Defendant NEW YORK CITY POLICE DETECTIVE SERAFIN RESTO punched Plaintiff JAIQUAN MOORE so hard that said Defendant fractured one or more of the bones in his hand.

**34.** Bystander video shows that additional Defendant Police Officers joined this first assailant Defendant Police Officer in beating Plaintiff JAIQUAN MOORE as he lay on the ground.

**35.** In the course of this assault, several of Plaintiff JAIQUAN MOORE's front teeth were cracked and fractured, permanently disfiguring Plaintiff JAIQUAN MOORE.

**36.** Prior to this incident, Plaintiff JAIQUAN MOORE's teeth were perfectly intact.

4

**37.** Plaintiff JAIQUAN MOORE also suffered a bruised eye, additional bruises, lacerations and injuries in the course of his beating by the Defendant Police Officers. Thereafter, Plaintiff JAIQUAN MOORE suffered from blurred vision in one eye.

**38.** Plaintiff JAIQUAN MOORE did not fight back in any way.

**39.** After a time, the Defendant POLICE OFFICERS handcuffed Plaintiff JAIQUAN MOORE, picked him up by his arms and threw him into a police car.

**40.** None of the Defendant POLICE OFFICERS told Plaintiff JAIQUAN MOORE that he was under arrest.

**41.** None of the Defendant POLICE OFFICERS told Plaintiff JAIQUAN MOORE why he was being arrested.

**42.** On information and belief, New York City Police Officers such as the Defendant POLICE OFFICERS would have responded to the questions of a Caucasian individual inquiring as to why they were being seized and whether they were under arrest.

**43.** Thereafter, Plaintiff JAIQUAN MOORE was transported to a police precinct, where he was held for several hours before being transported to Queens Hospital Center for medical treatment.

**44.** Upon arriving at the precinct, Plaintiff JAIQUAN MOORE was searched.

**45.** The search of Plaintiff JAIQUAN MOORE's person revealed nothing that would support allegations of criminal misconduct or misfeasance of Plaintiff JAIQUAN MOORE's part.

**46.** After receiving medical treatment at Queens Hospital Center, Plaintiff JAIQUAN MOORE was transported back to a police precinct before being transferred to Queens County Central Booking.

**47.** At his arraignment the following day, Plaintiff JAIQUAN MOORE was first informed that he was being charged with felony sale of a controlled substance, and assault on a police officer, among other crimes and offenses.

**48.** Plaintiff JAIQUAN MOORE had not been in possession of any controlled substances at any point in the incident described herein.

**49.** Chemical tests administered to Plaintiff JAIQUAN MOORE at Queens Hospital Center showed that he was not under the influence of alcohol or narcotics at the time of the incident at issue here.

**50.** On information and belief, both of the Caucasian individuals present in the car with Plaintiff JAIQUAN MOORE were in possession of quantities of heroin, a highly addictive and deadly narcotic.

**51.** On information and belief, upon searching the Caucasian individuals and discovering their narcotics, one or more of the Defendant Police Officers made a deal with the two Caucasians to falsely accuse Plaintiff JAIQUAN MOORE of having sold them the drugs.

**52.** On information and belief, one or more of the Defendant Police Officers made a deal with the two Caucasians to falsely accuse Plaintiff JAIQUAN MOORE of having sold them the drugs in order to justify the Defendant Police Officers' uses of force against Plaintiff JAIQUAN MOORE.

**53.** On information and belief, both of the Caucasian individuals made written statements implicating Plaintiff JAIQUAN MOORE at a police precinct, and were then released from custody with Desk Appearance Tickets.

**54.** On information and belief, it is highly unusual for persons caught by police with quantities of heroin to be released from custody before arraignment.

**55.** Defendant NEW YORK CITY POLICE DETECTIVE SERAFIN RESTO also falsely alleged that he saw an exchange of some sort between Plaintiff JAIQUAN MOORE and one of the two Caucasians in the front seat of the 2005 Subaru car before police approached the vehicle.

**56.** On information and belief, it is nearly impossible to make an observation of an exchange of objects between two individuals in a moving vehicle from another moving vehicle with sufficient certainty to justify a stop or arrest.

**57.** On information and belief, the Defendant Police Officers falsely charged Plaintiff JAIQUAN MOORE with crimes and offenses relating to assaulting an officer in order to justify the Defendant Police Officers' uses of force against Plaintiff JAIQUAN MOORE.

**58.** Defendant NEW YORK CITY POLICE DETECTIVE ERIK NELSON complained that Plaintiff JAIQUAN MOORE's (falsely alleged) assault on him caused him to suffer a bruised, lacerated and swelling left hand.

**59.** Defendant NEW YORK CITY POLICE SERGEANT ERIC SONNENBERG complained that Plaintiff JAIQUAN MOORE's (falsely alleged) assault on him caused him to suffer a bruised, swelling and painful right hand.

**60.** Defendant NEW YORK CITY POLICE DETECTIVE SERAFIN RESTO complained that Plaintiff JAIQUAN MOORE's (falsely alleged) assault on him caused him to suffer a broken hand.

**61.** Defendant NEW YORK CITY POLICE OFFICER BRIAN RITTO complained that he fell to the ground in the course of the incident herein and suffered a concussion.

**62. On information and belief, all of the above-described injuries claimed by the Defendant Police Officers were sustained while unjustifiably beating Plaintiff JAIQUAN MOORE, without proper cause or justification.**

**63.** On information and belief, all of the above-described injuries claimed by the Defendant Police Officers were sustained while unjustifiably beating Plaintiff JAIQUAN MOORE, without proper cause or justification.

**64.** Upon information and belief, the Defendant Police Officers did not formulate a rationale for arresting Plaintiff JAIQUAN MOORE before they seized and beat Plaintiff JAIQUAN MOORE.

**65.** Following investigation by the Queens County District Attorney, all felony charges against Plaintiff JAIQUAN MOORE were dropped, and Plaintiff JAIQUAN MOORE was allowed to plead guilty to a single count of disorderly conduct, a violation and not a crime, in full satisfaction of the two (2) felony charges and one (1) Class A Misdemeanor charge proffered against him.

**66.** Upon information and belief Plaintiff JAIQUAN MOORE was arrested without probable cause.

**67.** As a result of the foregoing, Plaintiff JAIQUAN MOORE sustained, *inter alia,* physical injuries, mental injuries, emotional distress, embarrassment, humiliation and deprivation of his constitutional rights.

### FIRST CLAIM FOR RELIEF
### <u>DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983</u>

**68.** Plaintiff JAIQUAN MOORE repeats, reiterates and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**69.** All of the aforementioned acts of the Defendants, their agents, servants and employees, were carried out under the color of state law.

**70.** All of the aforementioned acts deprived Plaintiff JAIQUAN MOORE of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

**71.** The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

**72.** The acts complained of were carried out by the aforementioned individual Defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

**73.** The Defendant POLICE OFFICERS and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**74.** As a result of the foregoing, Plaintiff's liberty was restricted for an extended period of time; he was put in fear for his safety and he was humiliated, without probable cause.

**75.** As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputations and standing within his community.

**76.** As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

### SECOND CLAIM FOR RELIEF
### EXCESSIVE USE OF FORCE UNDER 42 U.S.C. §1983

**77.** Plaintiff JAIQUAN MOORE repeats, reiterates and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**78.** Plaintiff JAIQUAN MOORE was beaten, struck, kicked, and brutalized by several of the Defendant Police Officers in the absence of any need for said applications of force.

**79.** Plaintiff JAIQUAN MOORE was subjected to excessive force by one or more individual Defendant Police Officers, in violation of his rights as guaranteed under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. Section 1983.

**80.** As a result of the above constitutionally impermissible conduct, Plaintiff JAIQUAN MOORE was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to their reputations and standing within their community.

**81.**  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

**82.**  Plaintiff JAIQUAN MOORE repeats, reiterates and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**83.**  The Defendant Police Officers and Defendant CITY OF NEW YORK had an affirmative duty to intervene on Plaintiff JAIQUAN MOORE's behalf to prevent the violation of his constitutional rights.

**84.**  The individual Defendant Police Officers failed to intervene on Plaintiff JAIQUAN MOORE's behalf to prevent the violation of his constitutional rights despite having had a realistic opportunity to do so.

**85.**  The individual Defendant Police Officers failed to intervene on Plaintiff JAIQUAN MOORE 's behalf to prevent the violation of his constitutional rights despite having substantially contributed to the circumstances within which the plaintiff's rights were violated by their affirmative conduct.

**86.**  As a result of the aforementioned conduct of the Defendants, Plaintiff JAIQUAN MOORE's constitutional rights were violated.

**87.**  As a result of the above constitutionally impermissible conduct, Plaintiff JAIQUAN MOORE was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

**88.**  As a result of Defendants' impermissible conduct, Plaintiff JAIQUAN MOORE demands judgment against Defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER *MONELL* ARISING FROM
## UNCONSTITUTIONAL POLICIES, PRACTICES AND CUSTOMS

**89.**  Plaintiff JAIQUAN MOORE repeats, reiterates and realleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**90.**  Defendants arrested and incarcerated Plaintiff JAIQUAN MOORE in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize Plaintiff's liberty, well-being, safety and constitutional rights.

**91.**  Upon information and belief, the arrest of Plaintiff JAIQUAN MOORE was

unlawful and lacked probable cause.

**92.** Upon information and belief, Plaintiff JAIQUAN MOORE was arrested to justify his wrongful seizure and detainment by the Defendant Police Officers.

**93.** Upon information and belief, the wrongful arrest of Plaintiff JAIQUAN MOORE was not undertaken by the Defendant Police Officers in furtherance of their duties, or otherwise privileged.

**94.** Upon information and belief, the arrest and detention of Plaintiff JAIQUAN MOORE was undertaken to clothe the wrongful actions of the Defendant Police Officers under color of law.

**95.** As a result of the aforementioned conduct of the Defendant CITY OF NEW YORK and the individual Defendant POLICE OFFICERS, Plaintiff JAIQUAN MOORE's constitutional rights were violated.

**96.** The acts complained of were carried out by the aforementioned individual Defendant Police Officers in their capacities as police officers and officials, with all of the actual and/or apparent authority attendant thereto.

**97.** The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

**98.** The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

a) wrongfully arresting individuals without probable cause due to perceived lack of respect for the police officer (i.e., "contempt of cop" arrests);

b) wrongfully arresting individuals without probable cause in attempts to justify excessive uses of force (i.e. "cover charge" arrests);

c) condoning needless and excessive applications of force against civilians by New York City Police Officers.

**99.** On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report," "The Report").[1]

---

[1] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York. Incorporated by reference herein and available online at http://www.parc.info/client_files/Special%20Reports/4%20- %20Mollen%20Commission%20-%20NYPD.pdf.

**100.** The July 7, 1994, Mollen Commission Report was prepared for and at the request of the Defendant CITY OF NEW YORK, and therefore knowledge of its contents may be imputed to Defendant CITY OF NEW YORK.

**101.** The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence."

**102.** The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994, Mollen Commission Report.

**103.** The *Mollen Commission Report* explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

**104.** The *Mollen Commission* went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

**105.** The *Mollen Commission* found that "[police b]rutality is… used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

**106.** One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance. It's not simply giving a beating. It's the other officers begin [sic] to accept you more." Id.

**107.** The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence…. [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the… [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse." The Report at 49.

**108.** Upon information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

**109.** Upon information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

**110.** That the Defendant CITY OF NEW YORK continued to have notice after 1994 that the officers and commanders of the New York City Police Department

11

continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

   a. **Ariza v. City of New York**, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers.... [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

   b. **White-Ruiz v. City of New York**, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996) ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]

   c. **United States v. Rosario**, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]

   d. **Barry v. New York City Police Dep't**, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence.... Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."

   e. **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff detective sues on pattern of retaliation following his reporting fellow detective to Internal Affairs, fellow officers cover for detective accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective] Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful.... [a]s a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated."]

**103.**   Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing decades-old custom or practice

of charging individuals with crimes and violations for personal vindication and/or as pretexts to justify use of force, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" charges.

**104.** Among the species of police corruption explored in The Report, particular note was made of the practice of "testilying," or false testimony and falsification of records in connection with arrests.  The Report at 36.

**105.** The Mollen Commission found "testilying" to be "probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns."  Id.

**106.** The Mollen Commission explained that officers are particularly prone to engage in "testilying" with respect to said charges because "[t]he vast majority of charges for narcotics or weapons possession crimes result in pleas without the necessity of grand jury or trial testimony, thus obviating officers' concerns about the risk of detection and possible exposure to criminal charges of perjury."  The Report at 37.

**107.** The Mollen Commission made particular note of "testilying" in an undisclosed unit of the NYPD's narcotics division, "where… [The Mollen Commission's] analysis of police records and intelligence sources indicated that the incidence of falsifications might run high."  The Report at 38-39.

**108.** The Report continues: "While we cannot disclose the details of our investigation because we have referred the evidence to a prosecutor, the evidence suggests that certain officers in this unit falsified documents and may have committed testimonial perjury to conceal constitutional violations.  Even more troubling, **the evidence suggests that the unit's commanding officer not only tolerated, but encouraged, this unlawful practice**."  The Report at 39 (emphasis added).

**109.** The practice of officers "testilying" with respect to narcotics charges continues in the NYPD to date.

**110.** Upon information and belief, the practice of officers "testilying" with respect to narcotics charges continues to be employed with particular frequency by narcotics officers in Brooklyn and Queens.

**111.** In 2008, now-former NYPD undercover officer Stephen Anderson was caught on video purchasing three bags of cocaine from two employees of a nightclub in Queens.[2]

---

[2] Jim Dwyer, "The Drugs? They Came From The Police," New York Times, October 13, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/10/14/nyregion/those-drugs-they-came-from-the-police.html?ref=nyregion

**112.** Anderson provided two of those bags of cocaine to then-fellow NYPD undercover officer Henry Tavarez. Id.

**113.** Tavarez then used the drugs to support the false arrests of four other people. Id.

**114.** As a result of this and like incidents, prosecutors in Brooklyn and Queens have dismissed charges against approximately four hundred (400) individuals whose arrests were believed to have been tainted by the corrupt acts of NYPD officers. Id.

**115.** Another detective from the same unit, Jason Arbeeny, was recently convicted of various crimes in relation to his own 2007 conduct of planting a bag of crack cocaine in the car of a Coney Island couple to support narcotics charges against said couple.[3]

**116.** In that case, on November 1, 2011, "[b]efore announcing the verdict, Justice Reichbach scolded the department for what he described as a widespread culture of corruption endemic in its drug units. 'I thought I was not naïve,' he said. 'But even this court was shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed.'" Id.

**117.** Justice Reichbach continued: "Anything goes in the never-ending war on drugs… and a refusal to go along with questionable practices raise the specter of blacklisting and isolation." Id.

**118.** The practice of false drug arrests is colloquially referred to as "flaking."[4]

**119.** The particular arrest of Plaintiff JAIQUAN MOORE is believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because Plaintiff JAIQUAN MOORE'S arrest was undertaken in the absence of probable cause to arrest, when Plaintiff JAIQUAN MOORE was not in possession of drugs and had not sold drugs to any individual(s).

**120.** Upon information and belief, the above-referred constitutionally violative policies, practices and customs remain widespread, open, and notorious throughout the NYPD to date.

---

[3] Tim Stellow, "Detective is Found Guilty of Planting Drugs," New York Times, November 1, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/11/02/nyregion/brooklyn-detective-convicted-of-planting-drugs-on-innocent-people.html?_r=2&partner=rss&emc=rss

[4] Parascandola, Kappstatter, Doyle and Schapiro, "Cop Morale Low After String of NYPD Scandals Puts Department Under Fire," New York Daily News, October 23, 2011, incorporated by reference herein and available online at http://articles.nydailynews.com/2011-10-23/local/30329895_1_bronx-cop-internal-affairs-bureau-captains-endowment-association

**121.**  Upon information and belief, the policymakers of the NYPD and Defendant CITY OF NEW YORK are aware that these practices and customs of NYPD officers continue to date, and have failed to take adequate steps to curb these practices and customs, which regularly cause the violation of citizens Constitutional rights.

**122.**  Defendant CITY OF NEW YORK has failed to meaningfully curb these Constitutionally-violative customs and practices to date.

**123.**  As a result of the aforementioned conduct of the Defendant CITY OF NEW YORK and the individual Defendant Police Officers, Plaintiff JAIQUAN MOORE 's constitutional rights were violated.

**124.**  As a result of the foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department, Plaintiff JAIQUAN MOORE was brutally beaten, falsely arrested and incarcerated.

**125.**  As a result of the above constitutionally impermissible conduct, Plaintiff JAIQUAN MOORE was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to his reputation and standing within his community.

**126.**  As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## EQUAL PROTECTION UNDER 42 U.S.C. § 1983

**127.**  Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

**128.**  At all times described herein, Plaintiff JAIQUAN MOORE was possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

**129.**  The Defendants detained, brutalized and arrested Plaintiff JAIQUAN MOORE without justification, notwithstanding their knowledge that such conduct would jeopardize Plaintiff's liberty, well-being, safety and constitutional rights.

**130.**  The acts complained of were carried out by the Defendants in their capacities as police officers and officials, with all of the actual and/or apparent authority attendant thereto.

**131.**  The acts complained of were carried out by the Defendants in their capacities as police officers and officials pursuant to the customs, policies,

usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

**132.** The actions of the Defendants, heretofore described, constituted unlawful detention, imprisonment, assault, and battery and were designed to and did cause mental harm, physical harm, pain and suffering both in violation of Plaintiff JAIQUAN MOORE's Constitutional rights as guaranteed under 42 U.S.C. §1983 and the United States Constitution, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for the Plaintiff JAIQUAN MOORE's exercise of his civil and constitutional rights of free expressive association as guaranteed by the Fourteenth Amendments to the United States Constitution as well as the Constitution of the State of New York.

**133.** Defendants did not similarly detain or brutalize the two Caucasian individuals otherwise similarly situated to Plaintiff JAIQUAN MOORE, who were actually found to be in possession of unlawful narcotics.

**134.** Instead, Defendants brutally beat and permanently disfigured the one African-American male present, and procured felony charges against him, while releasing the two (2) Caucasians actually found to be in possession of unlawful narcotics completely unharmed, with Desk Appearance Tickets.

**135.** As a result of the foregoing conduct, Plaintiff JAIQUAN MOORE was caused to suffer personal injuries, violations of his civil rights, emotional distress, anguish, anxiety, fear, humiliation and other irreparable damage to his life.

**136.** As a result of Defendants' impermissible conduct, Plaintiff JAIQUAN MOORE demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

    [a] Invoke pendent party and pendent claim jurisdiction.

    [b] Award appropriate compensatory and punitive damages.

    [c] Award appropriate declaratory and injunctive relief.

    [d] Empanel a jury.

    [e] Award attorney's fees and costs.

    [f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:    New York, New York
              May 15, 2014

                          Respectfully submitted,

                          SAMUEL B. COHEN [SC 7406]
                          STECKLOW COHEN & THOMPSON
                          10 SPRING STREET – SUITE 1
                          New York, New York 10012
                          [212] 566-8000
                          [212] 202-4952/FAX
                          SAM@WYLIELAW.COM

                          ROCHELLE S. BERLINER (RB 7463)
                          118-21 Queens Boulevard Suite 504
                          Forest Hills, NY  11375
                          [718] 261-5600
                          [718] 793-0385/FAX
                          BERLINERESQ@AOL.COM

                          ATTORNEYS FOR PLAINTIFF